**Affirmed, in Part, Reversed and Rendered, in Part, and Memorandum Opinion filed May15, 2012.**



In The

# Fourteenth Court of Appeals

---

## NO. 14-10-00837-CV

---

### PASADENA REFINING SYSTEM, INC., Appellant

### V.

### MIKE MCCRAVEN, Appellee

---

## NO. 14-10-00860-CV

---

### AUSTIN INDUSTRIAL SERVICES, LP AND BRITISH AMERICAN INSURANCE COMPANY, Appellants

### V.

### PASADENA REFINING SYSTEM, INC., Appellee

---

**On Appeal from the 151st District Court
Harris County, Texas
Trial Court Cause No. 2008-18597**

---

# MEMORANDUM OPINION

Mike McCraven, who was employed by Austin Industrial Services, LP (Austin), sustained injuries in connection with the replacement of a cart anchor cable of a Coker Unit owned by Pasadena Refining System, Inc. (PRSI). McCraven sued PRSI for negligence, and PRSI, in turn, filed third-party claims against (1) Austin for indemnity or contractual contribution, and (2) British American Insurance Company (BAIC) for additional insured status, breach of contract, and breach of the duty of good faith and fair dealing. Finding negligence, the jury allocated responsibility for McCraven's injuries as follows: PRSI 75%; Austin 20%; and McCraven 5%. In the first amended final judgment, the trial court awarded McCraven $5,355,059.42 (95% of $5,636.904.65), plus pre- and post-judgment interest and costs. The trial court awarded PRSI recovery of contractual contribution from Austin of 20% for the liability imposed by the jury's verdict. The trial court further found as a matter of law that PRSI was entitled to additional insured status under the CGL policy issued to Austin by BAIC, but that such coverage is only excess, not primary, coverage. The trial court further found that PSRI had nonsuited, without prejudice, its claims for breach of contract and breach of the duty of good faith and fair dealing.

Pending before this court are two appeals, which we have consolidated into one proceeding on our own motion. In the first appeal, PRSI appeals the first amended final judgment entered in favor of McCraven on his negligence claim for the injuries sustained on PRSI's premises, and the allocation of responsibility. We affirm that portion of the judgment awarding damages to McCraven on his negligence claim.

In the second appeal, Austin and BAIC appeal the first amended final judgment awarding contractual contribution and "additional insured" status to PRSI. We (1) reverse that portion of the judgment awarding PRSI contractual contribution from Austin and render judgment that PRSI take nothing on its claim for contractual contribution; (2) affirm that portion of the judgment awarding PRSI additional insured status; and (3)

2

reform the judgment to delete the trial court's finding that PRSI nonsuited, without prejudice, its claims for breach of contract and breach of the duty of good faith and fair dealing, and render judgment that PRSI take nothing on those claims.

## I. PRSI V. MCCRAVEN

### A. Background

PRSI owns and operates a refinery, including a Coker Unit. Coke is the black powder that remains after crude oil has been refined and is ultimately used as another fuel source. After the product is removed, the 77-foot tall drum, which holds the remaining coke, is "quenched"—filled with 50,000 gallons of water to cool the coke, which is about 900 degrees. It takes about four hours to fill the drum with water, and the coke soaks for an hour and a half. After the coke is cooled to 200 to 215 degrees, the hot water is drained from the drum, i.e., the water is released into a "sluiceway"—a five-foot wide drainage ditch. The water released into the sluiceway is black due to the coke residue. The coke is then "drilled" and removed from the drum with front-end loaders, and eventually offloaded from a conveyor to barges.

On September 5, 2007, PRSI generated a priority work order to Austin to replace the anchor cart cable on the second deck of the Coker Unit so that PRSI could drain the sluiceway on schedule. Austin sent a three-man crew, which included Tommy Ford, Kevin Kirkland, and Hugo Benavides, to do the job. A crane or boom truck was needed to lift the cable spool up to the second deck. Tony Shelman, a PRSI representative, recommended that the Austin crew use a Terex crane. After it was discovered that the Terex crane was not available, the Austin crew brought in a boom truck.

The sluiceway covers—metal plates with holes—had been removed prior to September 5, 2007, so that the sluiceway could be "hydroblasted" or cleaned. The sluiceway covers had not been put back in place, leaving the drainage ditch uncovered. Barricade tape had been placed around the area surrounding the open sluiceway. The

Austin crew took down the barricade tape, and Benavides drove the boom truck into a barricaded area, straddling the open sluiceway. Whether Shelman granted the Austin crew permission to place the boom truck in the barricaded area was disputed at trial.

After completing the job, the Austin crew needed to move the boom truck from the barricaded area, but needed PRSI's permission to remove the boom truck. Shelman initially refused the Austin crew's request to move the boom truck. However, Shelman changed his mind and, "against [his] better judgment," allowed the Austin crew to remove the boom truck after Kirkland claimed that he would be in "trouble" if he were not allowed to move the truck and return it timely.

At the same time, PRSI had already started the "drain," releasing hot water into the uncovered sluiceway. Also, the drain resulted in the overflow of the sluiceway. The evidence showed that PRSI had been having ongoing problems with the ability of the pumps to prevent water from overflowing the sluiceway during the drain. It was because of the overflow that PRSI told everyone to leave the area.

McCraven, a heavy equipment operator, testified that his supervisor, Greg Gray, assigned him the job of moving the boom truck, and drove him to the Coker Unit. McCraven testified that it was raining at that time. When Gray dropped him off, McCraven did not see the barricade. McCraven testified that "[t]here was no tape there." McCraven then went to the control room. McCraven encountered Shelman, who told him to "go ahead and move" the boom truck. McCraven responded that he was waiting for the Austin crew. When Ford and Kirkland arrived, McCraven followed them into the control room. In the control room, McCraven heard Ford and Kirkland say something about a barricade, but he was not paying attention to their conversation and he did not know what they were talking about.

McCraven and Kirkland left the control room and walked toward the boom truck. McCraven could not see the uncovered sluiceway due to the flooding of the area. Within

4

three to four feet of the truck, McCraven fell into the sluiceway, up to his hips in the scalding water. McCraven was able to climb out of the ditch. At that moment, McCraven did not realize how badly he was injured. McCraven folded up the outriggers on the boom truck and drove it to the maintenance shop. When McCraven said he wanted to wash the black water off, he was told to take a shower. When McCraven took his socks off, his skin came off, and he was taken to the hospital by ambulance. McCraven suffered second and third degree burns.

The evidence at trial showed that McCraven did not review the Job Hazard Analysis (JHA), the purpose of which was to list the specific hazards of the job. Ford testified that he and Kirkland should have gone over the JHA with McCraven and had McCraven sign it. Ford testified that he intended to tell McCraven about the barricade and the uncovered sluiceway, but McCraven was already heading toward the truck. Kirkland testified similarly that he tried to tell McCraven that he needed to sign the JHA, and it was his intention to warn McCraven about the barricade and the uncovered sluiceway, but McCraven was had started out for the truck. McCraven testified that Kirkland was walking a step or two behind him—close enough for them to talk. McCraven explained that he did not sign off on the JHA that day because he did not "think [he] needed one since [he] wasn't doing any work. [He] was just driving the truck out. And [he] never saw one."

McCraven sued PRSI for negligence; PRSI, in turn, brought a third-party claim against Austin.[1] Finding negligence, the jury found PRSI was 75% responsible for McCraven's injuries, Austin 20%, and McCraven 5%. PRSI filed a motion for JNOV on McCraven's negligence action, which the trial court denied at the March 29, 2010 hearing to enter judgment. On March 29, 2010, the trial court signed a final judgment, awarding McCraven $5,355,059.42 (95% of $5,636.904.65), plus pre- and post-judgment

---

[1] McCraven also sued PRSI for gross negligence; however, the trial court granted PRSI's motion for a directed verdict on gross negligence.

5

interest and costs. PRSI filed a motion to modify and, in the alternative, motion for remittitur and motion for new trial, complaining of the judgment entered in favor of McCraven, which the trial court denied. On June 1, 2010, the trial court signed the first amended final judgment, but it did not change anything regarding the award of damages to McCraven. PRSI filed a motion to modify the first amended final judgment and, in the alternative, motion for remittitur and motion for new trial, complaining of the judgment entered in favor of McCraven, which the trial denied.

In this appeal, PRSI challenges the legal and factual sufficiency of the evidence to support the jury's findings that PRSI (1) exercised or retained some control over the manner in which the work was performed, other than the right to order the work to start or stop or to inspect progress or receive reports;[2] and (2) had actual knowledge of the danger that injured McCraven.[3] PRSI also complains that the evidence is factually

---

[2] Question No. 1 of the charge asked:

Did Pasadena Refining System, Inc. exercise or retain some control over the manner in which the work was performed, other than the right to order the work to start or stop or to inspect progress or receive reports?

Question No. 1 instructed:

"Some Control" in this Question means that Pasadena Refining System, Inc. had the right to control the means, methods, or details of Austin Industrial Services' work to the extent that Austin Industrial Services' [sic] was not entirely free to do the work its own way.

[3] Question No. 2 in the charge asked:

Did the negligence, if any, of those named below proximately cause the injury in question?

Question No. 2 instructed, *inter alia*,:

With respect to the condition of the premises, Defendant PASADENA REFINING SYSTEM, INC., was negligent if[:]

1. the condition posed an unreasonable risk of harm, and

2. Defendant, PASADENA REFINING SYSTEM, INC., acting by or through its employees, had actual knowledge of the danger, and

3. Defendant, PASADENA REFINING SYSTEM, INC., failed to exercise ordinary care to protect Plaintiff, MIKE MCCRAVEN, from the danger, by both failing to

insufficient to support the jury's allocation of responsibility. McCraven brings one cross-point, contesting the applicability of Chapter 95 of the Civil Practice and Remedies Code.[4]

## B. Standard of Review

In reviewing the legal sufficiency of the evidence, we view the evidence in the light most favorable to the fact finding, crediting favorable evidence if reasonable persons could, and disregarding contrary evidence unless reasonable persons could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 822, 827 (Tex. 2005). We may not sustain a legal sufficiency, or "no evidence" point unless the record demonstrates: (1) a complete absence of a vital fact; (2) the court is barred by the rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence to prove a vital fact is no more than a scintilla; or (4) the evidence established conclusively the opposite of the vital fact. *Id.* at 810.

To evaluate the factual sufficiency of the evidence to support a verdict, we consider all the evidence and will set aside the verdict only if the evidence supporting the verdict is so weak or so against the overwhelming weight of the evidence that the verdict is clearly wrong and unjust. *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406–07 (Tex. 1998); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam). We may not pass upon the witnesses' credibility or substitute our judgment for that of the jury, even if the evidence would clearly support a different result. *Id.* at 407. The amount of evidence necessary to affirm a judgment is far less than necessary to reverse a judgment. *Thomas v. Uzoka*, 290 S.W.3d 437, 452 (Tex. App.—Houston [14th Dist.] 2009, pet. denied).

---

adequately warn Plaintiff, MIKE MCCRAVEN, of the condition and failing to make that condition reasonably safe.

[4] *See* TEX. CIV. PRAC. & REM. CODE §§ 95.001–.004 (West 2011).

## C. Chapter 95

The trial court held that Chapter 95 is applicable to this case and submitted it to the jury accordingly. When Chapter 95 applies, a property owner will not be liable for negligence claims arising from the failure to provide a safe work place unless:

> (1) the property owner exercises or retains some control over the manner in which the work is performed, other than the right to order the work to start or stop or to inspect progress or receive reports; and

> (2) the property owner had actual knowledge of the danger or condition resulting in the personal injury, death, or property damage and failed to adequately warn.

TEX. CIV. PRAC. & REM. CODE ANN. § 95.003.

The first prong of section 95.003 codifies the common-law holding of *Redinger v. Living, Inc.*, 689 S.W.2d 415, 418 (Tex. 1985), which adopted section 414 and the accompanying comments of the Restatement (Second) of Torts. *Dyall v. Simpson Pasadena Paper Co.*, 152 S.W.3d 688, 699 (Tex. App.—Houston 2004, pet. denied) (op. on reh'g en banc). The second prong requires actual knowledge, rather than merely constructive knowledge, by the premises owner concerning the allegedly dangerous condition. *Id.* Thus, the statutory actual knowledge standard replaces the pre-chapter 95 standard of constructive knowledge. *Phillips v. Dow Chem. Co.*, 186 S.W.3d 121, 133 (Tex. App.—Houston [1st Dist.] 2005, no pet.). Control and actual knowledge are two independent and necessary elements to impose liability. *Vanderbeek v. San Jacinto Methodist Hosp.*, 246 S.W.3d 346, 352 (Tex. App.—Houston [14th Dist.] 2008, no pet.).

McCraven brings a cross-point that the trial court erred in holding that Chapter 95 applies to this case.[5] However, because we find the evidence, as addressed below, is

---

[5] Section 95.002 restricts the scope of section 95.003 and states:

This chapter applies only to a claim:

legally and factually sufficient to support the jury's findings on control and actual knowledge, we need not address McCraven's cross-point.

## D. Actual Control

In its first and second issues, PRSI contends that the evidence is legally and factually insufficient to support the jury's finding that PRSI exercised or retained some control over the manner in which the work was performed, other than the right to order the work to start or to stop or to inspect progress or receive reports.

The right to control may be proven by either (1) a contractual right of control or (2) an exercise of actual control. *Dow Chem. Co. v. Bright*, 89 S.W.3d 602, 606 (Tex. 2002). McCraven does not assert that PRSI retained the contractual right to control the details of Austin's work. To be liable, PRSI must have had the right to control the means, methods, or details of the independent contractor's work to the extent that the independent contractor was not entirely free to do the work his own way. *Ellwood Tex. Forge Corp. v. Jones*, 214 S.W.3d 693, 700 (Tex. App.—Houston [14th Dist.] 2007, pet. denied). The right to control work must extend to the operative details of the contractor's work. *Id.* Control must relate to the injury the negligence causes. *Id.* Actual control is not satisfied by evidence showing that the property owner had control over the facilities. *Vanderbeek*, 246 S.W.3d at 352.

Although a determination of "operative details" is frequently the challenging analysis in a premises liability case, here it is not. The details of the actual repair of the

---

(1)     against a property owner, contractor, or subcontractor for personal injury, death, or property damage to an owner, a contractor, or a subcontractor, or an employee of a contractor or subcontractor; and

(2)     that arises from the condition or use of an improvement to real property where the contractor or subcontractor constructs, repairs, renovates, or modifies the improvement.

TEX. CIV. PRAC. & REM. CODE ANN. § 95.002. McCraven argues that Chapter 95 does not apply because his claim does not arise from the condition or use of the second deck cart and anchor cable where Austin constructed, repaired, renovated, or modified the second deck cart anchor cable. *See id.*

9

cable, which were not controlled by PRSI, are not at issue. Instead, the operative details of Austin's work that led to the injury here were (1) use of the boom truck; (2) placement of the boom truck; and (3) removal of the boom truck. Viewing all of the evidence, but with particular attention to the PRSI and Austin witnesses directly involved in these tasks, we conclude the evidence is legally and factually sufficient to support the jury's finding that PRSI exercised control.

Shelman recommended that the Austin crew use the Terex crane to reach the second deck were they would be working. However, the Terex crane was not available, leaving the boom truck as the other available option. Ford testified that the Austin crew informed Shelman that the Terex crane was not available, and Shelman knew the Austin crew was going to use the boom truck.

PRSI did not allow anyone to enter area of the sluiceway when it was barricaded. Shelman testified that he "can't let maintenance go into a barricaded area." Keith Overton of PRSI similarly testified: "When it's barricaded off, we don't have any duty over there at all. Until the plates are put back on, we don't drive a front-end loader through there, we don't do anything there."

The Austin crew could not enter the barricaded area without PRSI's permission. Ford testified that he could not enter a barricaded area without permission. Ford and Kirkland each testified that Shelman knew Austin would have to take the boom truck into the barricaded area, and that Shelman gave them permission to (1) take down the barricade tape, and (2) place the boom truck in the barricaded area. Shelman, however, testified that he believed that the Austin crew was going to use a Terex crane, and he did not think they were going to enter the barricaded area.

Ford testified that PRSI controlled when the boom truck would be moved because Austin could not move it until PRSI said the crew could do so. Dudley Hughes, a PRSI operations supervisor, also testified that Shelman had the authority to control whether and

when Austin could go in to retrieve the boom truck. Shelman testified that he initially told Kirkland that Austin would not be permitted to retrieve the boom truck from the barricaded area "because it wasn't supposed to be there in the first place, you're just going to have to wait until the drain is over. . . . You shouldn't have brought it over there, no." However, Shelman relented when Kirkland complained that he was going to be in "trouble." Shelman did not "want to get the guy fired. So against my better judgment, I said, Kevin, go get the truck. . . . I gave Kevin permission to get the truck. Against my better judgment." Shelman testified that "the drain had started" when he gave Kirkland permission to move the boom truck, even though Shelman stated that "[w]e were getting people out of the area as a precaution" due to the area flooding.

Ford also testified that McCraven could not have gone into the barricaded area without permission. McCraven testified that Shelman approached him when he was walking to the unit. When McCraven told Shelman that he was there to move the boom truck, Shelman told McCraven to "go ahead and move it."

The jury was entitled to resolve any conflicts in the testimony regarding the circumstances surrounding the use and removal of the boom truck. PRSI controlled whether Austin would use the boom truck, where Austin could place the boom truck, and when Austin could remove the boom truck after the job had been completed—all of which led to McCraven's injuries when he fell into the open sluiceway filled with hot water. This constitutes more than control over the facilities; it is control over the operative details of the work resulting in McCraven's injuries. We conclude that the evidence is both legally and factually sufficient to support the jury's finding that PRSI exercised or retained some control over the manner in which the work was performed, other than the right to order the work to start or stop or to inspect progress or receive reports. Accordingly, we overrule PRSI's first and second issues.

11

## E. Actual Knowledge

In its third and fourth issues, PRSI claims that the evidence is neither legally nor factually sufficient to support the jury's finding that PRSI had actual knowledge of the danger. McCraven was also required to prove that PRSI had actual knowledge of the danger or condition resulting in his injury and failed to adequately warn. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 95.003(2). "[K]nowledge that an activity is potentially dangerous is not sufficient to satisfy the second prong of Section 95.003—actual knowledge of the danger is required." *Dyall*, 152 S.W.3d at 709 n.18.

PRSI states that "the alleged danger or condition that resulted in Plaintiff's claimed personal injuries was the hot water that was drained from one of the Coker Unit drums and had backed up such that it overflowed and concealed the uncovered sluiceway." PRSI claims that its employees were not aware that the drain water had backed up into the sluiceway resulting in flooding obscuring the uncovered sluiceway. We disagree with PRSI's characterization of the condition at issue. The condition of the premises that made it dangerous to McCraven included not only the flooding condition, for which there was evidence of actual knowledge, but also the uncovered sluiceway, which was filled with hot water.

PRSI knew the sluiceways were uncovered on the day of the incident. Shelman testified that the drain covers had been off the sluiceway for at least a few days prior to September 5, 2007. Shelman stated that "[w]ell, when I came in that day we know [sic] the covers were off." Shelman and Hughes both testified that the drain covers had been removed intentionally so the sluiceway could be cleaned.

PRSI also knew that the water was scalding hot. Hughes testified that it was intended that the water released during the drain would be hot—approximately 212 degrees. Shelman testified that when he gave Kirkland permission to move the boom truck, "the drain had started," with 212-degree water draining into the sluiceway.

12

Shelman down-played the seriousness of 212-degree water by stating that "212 [degrees] is hot, but it's not like 900 [degrees]." However, Shelman admitted that "212 [degrees] is boiling water."

PRSI also knew that water was overflowing the sluiceway and flooding the area. Shelman testified that, on September 5, 2007, "[w]e knew it was going to slightly run over the parameter of the sluiceway . . . [b]ecause the pumps were not keeping up. We still had the covers off. We were working on that system."[6] PRSI knew there was flooding that day because the problem with the overflowing sluiceway had not been fixed. Shelman explained, "[w]e were getting people out of the area as a precaution." Shelman minimized the hazard caused by the overflow of the sluiceway when he stated, "[y]ou can see" the open sluiceway even when the water is overflowing the sluiceway. However, Keith Overton of PRSI admitted that it would be difficult to see the open sluiceway or whether its covers are off when it floods.

Shelman gave Kirkland permission to move the boom truck after the drain had started, with actual knowledge that hot water would flood the uncovered sluiceway. This is evidence of more than knowledge of a "potentially dangerous" condition. We conclude that the evidence is legally and factually sufficient to support the jury's finding that PRSI had actual knowledge of the danger or condition resulting in resulting in McCraven's injury. We overrule PRSI's third and fourth issues.

### F. Apportionment of Responsibility

In its fifth issue, PRSI challenges the factual sufficiency of the evidence to support the jury's allocation of 75% proportionate responsibility to PRSI, 20% to Austin, and 5% to McCraven. PRSI argues that "the great weight of the evidence militates in favor of a fault allocation that places significantly more fault on Austin and McCraven."

---

[6] The PRSI investigation report of the incident concluded that "[w]orking in flooded areas ha[d] become an accepted practice by refinery personnel."

PRSI argues that the following facts support an allocation of more than 20% responsibility to Austin: (1) PRSI recommended using a Terex crane to avoid being in the barricaded area; (2) the Austin crew decided to use the boom truck, which had to be located in the barricaded area in order to be able to lift the cable spool over the second deck; (3) the Austin crew created a potentially dangerous condition by positioning the truck to straddle the sluiceway, requiring the driver to navigate around the sluiceway; (4) the Austin crew did not note this potentially dangerous condition on its JHA, which Austin admitted violated Austin's safety policies and procedures; (5) the PRSI operator in the area where the drums are located did not see the boom truck or know it was in the barricaded area until after the drain had started; (6) the Austin foreman—who should have known the nature of the Coker Unit operation, including the drain—pulled the original heavy equipment operator who had positioned the boom truck and substituted McCraven, who was not familiar with the Coker Unit, to get the truck during heavy rain; (7) the Austin crew failed to inform McCraven of the open sluiceway, which was covered with steaming, hot water, and failed to go over the JHA and job safety check list with him, which should have been updated to reflect the flooding of the area where the boom truck was located over the sluiceway.

PRSI argues that McCraven demonstrated "an almost total failure to use 'ordinary care'—which must total more than 5% of the cause of his injuries." PRSI contends that the following facts support a larger allocation of responsibility to McCraven: (1) McCraven disobeyed all safety rules; (2) McCraven did not communicate with the crew to learn the conditions of the job site; (3) McCraven made no effort to locate and read the JHA as required by Austin's safety policies; (4) McCraven overheard some discussion about a barricade, but failed to inquire about it; (5) McCraven admitted that he had been in the business long enough to know not to cross a barricade; (6) the Austin crew members stated that McCraven took off toward the truck without their being able to talk to him about the job conditions; (7) McCraven claimed to have seen the steam rising off the water, but it did not "register" with him that that water was hot, as it did with his

14

coworkers; and (8) McCraven claimed not to have seen the barricade tape, which would have been hard not to see from where the foreman dropped him off.

The jury is given wide latitude in performing its sworn duty to serve as the fact finder in allocating responsibility. TEX. CIV. PRAC. & REM. CODE ANN. § 33.003 (West 2008); *Rosell v. Cent. W. Motor Stages, Inc.*, 89 S.W.3d 643, 659 (Tex. App.—Dallas 2002, pet. denied). Even if the evidence could support a different percentage allocation of responsibility, an appellate court may not substitute its judgment for that of the jury. *Samco Props., Inc. v. Cheatham*, 977 S.W.2d 469, 478 (Tex. App.—Houston [14th Dist.] 1998, pet. denied).

With respect to McCraven's actions, the jury was entitled to believe McCraven's testimony that he did not see the barricade tape, and he did not know the sluiceways were uncovered. It was undisputed that McCraven did not go over the JHA, but it was because he did not think it was necessary. With respect to Austin's actions, it was undisputed that Austin did not tell McCraven that the boom truck was straddling an uncovered sluiceway or go over the JHA with McCraven.

Ultimately, however, the evidence supports the jury's allocation of 75% responsibility to PRSI. Although the evidence about whether Shelman gave the Austin crew permission to use the boom truck in the barricaded area and remove the barricade tape was disputed, the jury was entitled to believe Ford's and Kirkland's testimony. It was, however, undisputed that PRSI knew the sluiceway covers had been removed, but not replaced, and hot water would drain into sluiceway. It was also undisputed that Shelman gave the Austin crew permission to remove the boom truck from the barricaded area, even though the drain had started and PRSI had evacuated personnel from the barricaded area due to flooding because of ongoing problems with the pumps. We conclude that the above-detailed evidence amply supports the jury's determination on allocation of responsibility. We overruled PRSI's fifth issue.

15

## G. Conclusion

Having overruled all of PRSI's issues in its appeal of the judgment awarding damages to McCraven for negligence and finding that PRSI is 75%, Austin 20%, and McCraven 5% responsible for McCraven's injuries, we affirm that portion of the judgment.[7]

## II. AUSTIN & BAIC V. PRSI

### A. Background

In connection with McCraven's personal injury suit, PRSI filed an original third-party petition against Austin, seeking indemnification for its own negligence pursuant to the November 4, 2005 "Technical Services and Maintenance Agreement" between PRSI and Austin (PRSI/Austin agreement). Austin moved for summary judgment on the ground that the PRSI/Austin agreement did not provide for indemnification for PRSI's own negligence. PRSI then filed a first amended third-party petition, seeking contractual indemnity and/or contribution. On May 1, 2009, the trial court granted, in part, and denied, in part, Austin's motion for summary judgment. The court granted Austin's motion to the extent that PRSI was seeking attorney's fees and costs, but denied Austin's motion to the extent that it sought summary judgment on PRSI's contractual contribution claim and held that PRSI was entitled to recover contractual contribution from Austin. Austin filed a motion to reconsider the partial denial of summary judgment, which the trial court denied.[8]

---

[7] As an initial matter, in his appellee's brief, McCraven claims PRSI's arguments on appeal are contrary to its position at trial, where PRSI's counsel admitted PRSI's responsibility for McCraven's injurirs to the jury during opening arguments. McCraven suggests that statements by PRSI's counsel could constitute judicial admissions, while PRSI responds that its counsel's statements were not judicial admissions. Because we find the outlined evidence legally and factually sufficient to support the jury's findings on actual control and actual knowledge, we need not address counsel's purported judicial admissions.

[8] PRSI's proposed order denying Austin's motion to reconsider included the following paragraph:

IT IS FURTHER ORDERED ADJUDGED AND DECREED that Defendant and Third-Party Plaintiff, Pasadena Refining System, Inc. ("PRSI"), is entitled to recover

16

PRSI filed a second amended third-party petition, adding BAIC as third-party defendant. PRSI filed a third amended third-party petition, which was the live petition at trial, adding claims against BAIC for breach of contract and breach of the duty of good faith and fair dealing, and seeking a declaratory judgment that it was an additional insured under the BAIC commercial general liability policy (CGL policy) issued to Austin.

At a hearing on February 10, 2010, before resting at trial, PRSI stated that it was reserving its right to address "any issues . . . that may arise out of [its] claim against [BAIC] related to additional insured coverage, which may or may not become relevant depending on what happens." After PRSI had rested, Austin and BAIC moved for directed verdict, asserting, *inter alia*, that PRSI had failed to put on any evidence on its claims for contractual contribution, additional insured status, breach of contract, or breach of the duty of good faith and fair dealing during its case-in-chief and had failed to raise a fact issue. PRSI responded that it did not intend to pursue its claims for breach of contract and breach of the duty of good faith and fair dealing, but it was not abandoning its declaratory judgment claim against BAIC on additional insured coverage. PRSI then nonsuited its claims for breach of contract and breach of the duty of good faith and fair dealing against BAIC. The trial court denied the motion for directed verdict, and allowed PRSI to nonsuit its claims against BAIC for breach of contract and breach of the duty of good faith and fair dealing.

The jury returned a verdict finding PRSI 75% responsible for McCraven's injuries, Austin 20% responsible, and McCraven 5% responsible. On March 29, 2010, the trial court signed a final judgment awarding McCraven damages. The final judgment stated that PRSI had non-suited its remaining claims against BAIC, without prejudice, in open

contractual contribution from Austin in connection with PRSI's third-party claims against Austin.

The trial court, however, struck through that paragraph when it signed the order denying the motion to reconsider.

17

court. The judgment, however, did not mention PRSI's contractual contribution claim against Austin or its additional insured claim against BAIC.[9]

Austin filed a motion to modify, reform, or correct the final judgment to reflect that PRSI take nothing on its contractual contribution claim because PRSI (1) had not moved for summary judgment on that claim and, therefore, the trial court granted more relief than was requested; and (2) had failed to prosecute that claim at trial. BAIC also moved for the trial court to modify, correct, or reform the final judgment, arguing that (1) nonsuit was not available to PRSI after it had had rested at trial; and (2) PRSI had not prosecuted its additional insured claim and could not "defer" it.

PRSI filed a motion for entry of judgment and motion to modify, correct, or reform the final judgment to (1) reflect that PRSI was entitled to contractual contribution from Austin consistent with the trial court's prior rulings; and (2) declare that PRSI was entitled to coverage as an additional insured under the BAIC CGL policy. The trial court held a hearing on May 24, 2010.

On June 1, 2010, the trial court signed a first amended final judgment in which the court clarified that it could not have granted contractual contribution in the summary judgment order because PRSI had not moved for summary judgment on that claim; therefore, the trial court considered such an award in the summary judgment order a "nullity." The trial court, however, stated that the issue was a question of law and it still had plenary power to decide the contribution claim. Therefore, the trial court found that, as a matter of law, PRSI should be awarded recovery of contractual contribution from Austin in the amount of 20% of the total award, and awarded the same.

---

[9] PRSI had requested that the trial court declare that (1) the waiver of subrogation provisions in the PRSI/Austin agreement and/or the policy were valid and enforceable; and (2) the waiver of subrogation provisions in the agreement and/or policy barred BAIC's right to recover any portion of its lien from any party, including McCraven. The trial court granted PRSI's motion for partial summary judgment on those claims. The final judgment stated that summary judgment had previously been granted against BAIC that any right of subrogation had been contractually waived. BAIC has not challenged that portion of the judgment on appeal.

The amended final judgment still states that PRSI non-suited, without prejudice, its claims for breach of contract and breach of the duty of good faith and fair dealing. against BAIC. The trial court found further that, as a matter of law, PRSI is entitled to "additional insured" status under the BAIC CGL policy, but that such coverage is excess, not primary, coverage.

Austin filed a motion to modify, correct, or reform the first amended final judgment to reflect that PRSI take nothing on its contractual contribution claim against Austin. BAIC also filed a motion to modify, correct, or reform the first amended final judgment to reflect that PRSI's claims are dismissed with prejudice, and PRSI take nothing on its claims against BAIC. The trial court denied Austin's and BAIC's motions.

As appellants in this appeal, Austin and BAIC bring six issues, complaining of the first amended final judgment awarding PRSI contribution from Austin and holding that PRSI is an additional insured under the BAIC CGL policy.

### B. Austin and BAIC's Procedural Issues

In their first through fourth issues, appellants assert that (1) the trial court erred in denying their motions for directed verdict; (2) PRSI abandoned its claims for affirmative relief; (3) PRSI's mistaken belief that the denial of Austin's motion for summary judgment constituted a dispositive ruling does not excuse PRSI's failure to prosecute its contractual contribution claim; and (4) PRSI's purported reservation of its claim for additional insured status did not preserve the claim.

Essentially, appellants contend that the trial court could not enter judgment in favor of PRSI on its claims for contractual contribution and additional insured status because PRSI did not attempt to prosecute those claims during trial, but, instead, waited until after the trial court had signed the March 29, 2010 final judgment to request judgment on those claims. We conclude the fact that the trial court had plenary power to sign the first amended final judgment is dispositive of appellants' first through fourth issues.

A trial court retains jurisdiction over a case for a minimum of thirty days after a final judgment, during which the court has plenary power to change its judgment. TEX. R. CIV. P. 329b(d); *Lane Bank Equip. Co. v. Smith S. Equip. Co.*, 10 S.W.3d 308, 310 (Tex. 2000). A motion to modify, correct, or reform a judgment, if filed within this initial thirty day period, extends the trial court's plenary power for up to an additional seventy-five days, depending on when or whether the court acts on the motions. TEX. R. CIV. P. 329b(g); *Lane Bank Equip. Co.*, 10 S.W.3d at 310.

A trial court retains full control over its judgment while it has plenary power. *Esty v. Beal Bank S.S.B.*, 298 S.W.3d 280, 294 (Tex. App.—Dallas 2009, no pet.); *WMC Mortg. Corp. v. Starkey*, 200 S.W.3d 749, 751 (Tex. App.—Dallas 2006, pet. denied). Plenary power is broadly defined as the court's power to dispose of any matter before it. *WMC Mortg. Corp.*, 200 S.W.3d at 751. "A trial court's jurisdictional power over its judgment is full, complete, absolute, and unqualified." *Shelby Operating Co. v. City of Waskom*, 964 S.W.2d 75, 80 (Tex. App.—Texarkana 1997, pet. denied); *Mesa Agro v. R.C. Dove & Sons*, 584 S.W.2d 506, 508 (Tex. Civ. App.—El Paso 1979, writ ref'd n.r.e.); *see also In re Provine*, 312 S.W.3d 824, 829 (Tex. App.—Houston [1st Dist.] 2009, orig. proceeding) ("A trial court's power to modify its judgment is virtually absolute during the period of its plenary power."). A trial court has authority to *sua sponte* modify the judgment within the duration of its plenary power. *Horseshoe Bay Resort Sales Co. v. Lake Lyndon B. Johnson Improvement Corp.*, 53 S.W.3d 799, 814 (Tex. App.—Austin 2001, pet. denied).

Most of appellants' arguments center on the consequences for failing to submit a fact issue to the jury. *See AVCO Corp. v. Interstate Sw., Ltd.*, 251 S.W.3d 632, 666 (Tex. App.—Houston [14th Dist.] 2007, pet. denied) ("When a plaintiff fails to request an issue and an affirmative finding regarding the omitted issue is essential to recovery, the trial court must render judgment for the defendant."). However, the construction of an unambiguous contract or insurance policy is a question of law for the court. *Tawes v.*

*Barnes*, 340 S.W.3d 419, 425 (Tex. 2011); *State Farm Lloyds v. Page*, 315 S.W.3d 525, 527 (Tex. 2010). As addressed below, neither the PRSI/Austin agreement nor the BAIC CGL policy is ambiguous. Because the interpretation of the PRSI agreement and the BAIC CGL policy were both questions of law for the trial court's determination, there was nothing to submit to the jury. PRSI, Austin, and BAIC each filed a timely motion to modify, correct, or reform the March 29, 2010 final judgment, extending the trial court's plenary power. Therefore, the trial court ultimately had full power to set aside, modify, correct, or reform the March 29, 2010 final judgment by its June 1, 2010 first amended final judgment. We overrule appellants' first through fourth issues.

### C. Contractual Indemnity

In their fifth issue, appellants assert that the trial court erred when it construed the PRSI/Austin agreement to provide contractual contribution. Our primary concern when we construe a written contract is to ascertain the parties' true intent as expressed in the contract. *In re Serv. Corp. Int'l*, 355 S.W.3d 655, 661 (Tex. 2011) (per curiam) (orig. proceeding); *Epps v. Fowler*, 351 S.W.3d 862, 865 (Tex. 2011). "We must examine and consider the entire writing 'in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless.'" *Grohman v. Kahlig*, 318 S.W.3d 882, 887 (Tex. 2010) (per curiam) (quoting *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 662 (Tex. 2005)). "We begin this analysis with the contract's express language." *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex. 2011). The construction of an unambiguous contract is a question of law for the court, which we may consider under a de novo standard of review. *Tawes*, 340 S.W.3d at 425.

The following are the material provisions of the PRSI/Austin agreement:

17.1 CONTRACTOR shall indemnify and hold harmless COMPANY, its divisions parent and subsidiaries, directors, officers, agents, contractor, and employees against any and all claims, demands or causes of action, and all

costs, losses, liabilities, expenses and judgments incurred in connection therewith, including attorneys' fees and costs of court ("Liabilities") brought by any of CONTRACTOR'S employees or representatives, or by any third party, based upon, in connection with, resulting from or arising out of CONTRACTOR'S actions or inactions under this Agreement or COMPANY'S use of the Work; provided however, that CONTRACTOR'S contractual obligation of indemnification shall not extend to such Liabilities, to the extent arising from COMPANY's negligence or other fault or to strict or vicarious liability imposed upon COMPANY as a matter of law in connection with the Work, the negligence or intentional misconduct of any COMPANY party or of any third party.

17.2 Conversely, COMPANY will indemnify and hold harmless CONTRACTOR, its directors, officers, agents, contractors, and employees against any and all claims, demands or causes of action, and all costs, losses, liabilities, expenses and judgments incurred in connection therewith, including attorneys' fees and costs of court, brought by any third party to the extent based upon, in connection with, resulting from or arising out of COMPANY's negligence or intentional misconduct or COMPANY's use of the Work; provided, however, that COMPANY's contractual obligation of indemnification shall not extend to the negligence or other fault of CONTRACTOR or strict liability imposed upon CONTRACTOR as a matter of law in connection with the Work.

17.3 In the event that both CONTRACTOR and COMPANY are adjudicated negligent or otherwise at fault or strictly liable without fault with respect to the damage or injuries sustained by such third party claimant, this contractual obligation of indemnification shall continue but each of CONTRACTOR and COMPANY shall indemnify the other (the indemnitee) only for the percentage of responsibility of the damage or injuries adjudicated to be attributed to the indemnitor.

As a preliminary matter, appellants contend that section 17.3 of the PRSI/Austin agreement—the provision relied upon by PRSI for its claim for contractual contribution—is not applicable to this case. Specifically, appellants argue that section 17.3, like section 17.2, applies only where the claimant is a "third party." Appellants contrast this language against section 17.1, which applies to claims not only by a "third party" but also to claims by either "CONTRACTOR'S employees or representatives." Citing to section 17.1, appellants claim that the parties envisioned claims by third-party

22

claimants to be separate and distinct from claims brought by Austin's employees. Thus, appellants argue that section 17.3 confines its applicability to third parties. In other words, even if section 17.3 were construed as affording PRSI a right of contractual contribution, it does not afford that right here where suit is brought by McCraven—one of "CONTRACTOR'S employees."

PRSI responds that a reasonable interpretation of the plain language of the PRSI/Austin agreement requires that the phrase "such third party claimant" in section 17.3 be read as a reference back to "section 17.1's list of who might sue PRSI or Austin, including 'any' of Austin's employees or representatives or 'any other third party.'"

We agree with appellants' interpretation. Both sections 17.2 and 17.3 refer solely to third parties. In contrast, section 17.1 refers to third parties **and** employees and representatives. If PRSI were correct, and the term "third party" encompassed not only third parties, but also employees and representatives, then the words "employees and representatives" would be rendered superfluous or without meaning. Traditional rules of contract construction do not permit us to disregard words when interpreting contracts. *See Grohman*, 318 S.W.3d at 887 (stating that courts must examine and consider entire writing in order to harmonize and give effect to all contract provisions so that none will be rendered meaningless).

Moreover, PRSI does not explain why the phrase "such third party claimant" found in section 17.3 more appropriately refers back to section 17.1 than to the adjacent section 17.2. The term "such" more logically refers to the third party claims described in section 17.2, immediately above. To look to section 17.1 to determine the definition of "such third party claimant" results in a strained interpretation.

Finally, PRSI argues that the intent of the term "such third party claimant" is reflected by section 17.4, which requires as a "condition precedent to the indemnitor's contractual obligation under this Agreement that the party seeking indemnity shall

provide written notice of the third party claim . . . within thirty (30) days after such third party claim . . . is received by the party seeking indemnity, and the indemnitor shall thereafter have the right to participate in the investigation, defense and resolution of such third party claim." However, nothing in section 17.4 gives greater definition to the term "third party." To interpret the contract as requiring notice as a condition precedent to indemnify solely for third-party claims is not an unreasonable interpretation.

We hold that the PRSI/Austin agreement does not provide a contractual right to contribution for adjudicated liability under section 17.3 because the damage or injuries were sustained by "CONTRACTOR'S employee," not by a third-party claimant. Therefore, we sustain appellants' fifth issue regarding construction of the PRSI/Austin agreement.

### D. Additional Insured

In their sixth issue, appellants assert that the trial court erred when it determined, as a matter of law, that PRSI is entitled to additional insured coverage under the BAIC CGL policy. The rules governing interpretation of contracts, in general, apply to interpreting insurance policies. *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 126 (Tex. 2010) (op. on reh'g). When construing an insurance contract, the court's primary concern is give effect to the written expression of the parties' intent. *Mid-Continent Cas. Co. v. Global Enercom Mgmt., Inc.*, 323 S.W.3d 151, 154 (Tex. 2010) (per curiam). If an insurance contract uses unambiguous language, we must enforce it as written. *Don's Bldg. Supply, Inc. v. OneBeacon Ins. Co.*, 267 S.W.3d 20, 23 (Tex. 2008). The fact that the parties may disagree about the policy's meaning does not create an ambiguity. *Page*, 315 S.W.3d at 527. Only if the policy is subject to two or more reasonable interpretations may it be considered ambiguous. *Id.* Whether a particular provision or the interaction among multiple provisions creates an ambiguity is a question of law. *Id.*

24

Section 15.4 of the PRSI/Austin agreement includes the following language regarding "additional insured":

> COMPANY be added as an additional insured in all such certificates, except insurance providing protection against worker's or workmen's compensation claims, to the extent of the coverage required and only in the minimum amount required by contract, and only with respect to liability arising out of work done by or on behalf of the named insured, and only to the extent COMPANY is indemnified by CONTRACTOR under the terms of the contract.

The additional insured endorsement in the BAIC CGL policy describes who is an insured as follows:

> "Any person or organization . . . for whom the named insured . . . has specifically agreed by written contract to procure bodily injury . . . insurance, provided that:
>
> a. This insurance applies only to the type of coverage which is otherwise provided by this policy and which the named insured has agreed to provide by contract, but in no event shall the coverage exceed, in type or amount, the coverage otherwise provided by this policy;
>
> b. The amount of insurance is limited to the minimum amount required by such written contract, or to the limits of liability provided by this policy, whichever is lower;
>
> c. The insurance applies only with respect to liability arising out of the work done by or on behalf of the named insured under such written contract; and
>
> d. This insurance shall apply as primary insurance with regard to the additional insured for whom the named insured has agreed by written contract to provide insurance on a primary basis, and in such cases, any other insurance or self insurance available to the additional insured shall be excess to, and not contributory with, the insurance afforded by this policy to that additional insured. However, if the contract does not specifically require that this insurance shall be primary, this this insurance shall be excess over and not contributory with any other valid and collectible insurance or self insurance available to the additional insured whether such

other insurance or self insurance is primary, excess, or contingent, or on any other basis.

In *Evanston Insurance Co. v. ATOFINA Petrochemicals, Inc.*, the Texas Supreme Court addressed "whether a commercial umbrella policy that was purchased to secure the insured's indemnity obligation in a service contract with a third party also provide[d] direct liability coverage for the third party." 256 S.W.3d 660, 662 (Tex. 2008) (op. on reh'g). ATOFINA contracted with Triple S Industrial Corporation to perform maintenance and construction work at ATOFINA's Port Arthur refinery. *Id.* The contract contained an indemnity provision and a requirement that Triple S carry certain minimum levels of liability insurance coverage. *Id.* Triple S agreed to indemnify ATOFINA for all personal injuries and property losses sustained during the performance of the contract "except to the extent that any such loss is attributable to the concurrent or sole negligence, misconduct, or strict liability of [ATOFINA]." *Id.* Triple S also agreed to carry at least $500,000 of primary comprehensive general liability (CGL) insurance, "[i]ncluding coverage for contractual liability insuring the indemnity agreement," and an excess (or "umbrella") liability policy "following form for [the CGL policy]" of at least $500,000. *Id.* at 662–63. Triple S purchased a commercial umbrella policy from Evanston Insurance Company. *Id.* at 663. Jones, a Triple S employee working at the ATOFINA facility, drowned after he fell through the corroded roof of a storage tank filled with fuel. *Id.* Jones's survivors sued Triple S and ATOFINA for wrongful death. *Id.* ATOFINA demanded coverage from Evanston as an additional insured under the umbrella policy, but Evanston denied the claim, and ATOFINA brought Evanston into the case as a third-party defendant for a declaration of coverage. *Id.*

The supreme court noted that, under the terms of the service contract, ATOFINA was not entitled to be indemnified by Triple S if the Jones loss was occasioned in any way by ATOFINA's negligence. *Id.* However, ATOFINA did not seek indemnity from Triple S; instead, it claimed that it was entitled to indemnification from Evanston by virtue of its status as an additional insured on the umbrella policy Evanston issued to

26

Triple S. *Id.* at 663–64. "Instead of looking, as the court of appeals did, to the indemnity agreement in the service contract to determine the scope of any coverage, we base our decision on the terms of the umbrella insurance policy itself." *Id.* at 664.

The policy provided that ATOFINA was an additional insured: "A person or organization for whom [Triple S] ha[s] agreed to provide insurance as is afforded by this policy; only with respect to operations performed by [Triple S] or on [Triple S's] behalf, or facilities owned by or used by [Triple S]." *Id.* Rejecting Evanston's argument that ATOFINA was not an additional insured because the language did not cover an additional insured for its own negligence, the court held that the injury "respected" operations performed by Triple S because Triple S employed the worker who was performing the operation at the time and place of injury, and that any negligence of ATOFINA did not change the result. *Id.* at 667. Therefore, there was coverage under that provision. *Id.*

Appellants claim that *Evanston* is distinguishable because section 15.4 the PRSI/Austin agreement "shows that the parties' intent for requiring additional insured coverage was to ensure performance of the indemnity provision." In other words, according to appellants, the additional insured provision expressly links its coverage to indemnification, and PRSI's status as an additional insured is triggered "to the extent [PRSI] is indemnified by [Austin] under the terms of the contract."

Appellants rely on *Shell Chemical L.P. v. Discover Property & Casualty Insurance Co.* in support of its argument that the PRSI/Austin agreement evidenced the parties' intent that requiring additional insured coverage was to ensure performance of the indemnity provision. CIV. A. No. H-09-2583, 2010 WL 1338068 (S.D. Tex. Mar. 29, 2010). In *Shell Chemical*, the "Texas Truckers Policy" provided that Shell was an additional insured "but only with respect to their legal liability for acts or omissions of [Mission]." *Id.* at *2. "The Texas Supreme Court noted that, had the parties in *Evanston* wanted to provide additional insured status only for the additional insured's vicarious

27

liability for the policy holder's conduct, 'language clearly embodying that intention was available.'" *Id.* (quoting *Evanston*, 256 S.W.3d at 666). In *Shell Chemical*, "[t]he Texas Truckers Policy contained such language 'clearly embodying' the intent to provide coverage, and a duty to defend, to Shell as an additional insured only as to an injured party's claim that Shell is vicariously liable for Mission's acts or omissions." *Id.*

Appellants' reliance on *Shell Chemical* is misplaced. The crux of appellants' argument is that the PRSI/Austin agreement shows the parties' intent to limit additional insured status "only to the extent COMPANY is indemnified by CONTRACTOR under the terms of the contract." The **policy** in *Shell Chemical* limited the scope of additional insured status. *See id.* Pursuant to *Evanston*, we look to the unambiguous BAIC CGL policy, which neither contains a limitation on additional insured coverage concerning indemnity under the PRSI/Austin agreement nor incorporates any such limitation. We contrast this absence of such a limitation with the policy's express incorporation of the PRSI/Austin agreement's limitations pertaining to the amount of coverage that will be available.

Moreover, "where an additional insured provision is separate from and additional to an indemnity provision, the scope of the insurance requirement is not limited by the indemnity claims." *Evanston*, 256 S.W.3d at 664 n.5 (citing *Getty Oil Co. v. Ins. Co. of N. Am.*, 845 S.W.2d 794, 804 (Tex. 1992)). The insurance requirement does not support the indemnity provision; it does not provide that Austin must maintain coverage for its indemnity obligations. Instead, the insurance requirement is a separate and independent obligation from the indemnity provision. Therefore, direct insured status was extended to PRSI as an additional insured. *See id.* at 670 ("[I]t is unmistakable that the agreement in this case to extend *direct* insured status to ATOFINA as an additional insured is separate and independent from ATOFINA's agreement to forego *contractual* indemnity for its own negligence.") (emphasis added).

Relying on the PRSI/Austin agreement, appellants attempt to create an ambiguity "as to the intentions of the parties and whether coverage is triggered." However, looking solely to unambiguous language of the BAIC CGL policy pursuant to *Evanston*, we find no ambiguity as to the parties' intentions that PRSI be an additional insured. We overrule appellants' sixth issue.

## E. Breach of Contract and Breach of the Duty of Good Faith & Fair Dealing

Although not set out in a separate appellate issue, appellants complain that PRSI's purported nonsuit of its claims against BAIC for breach of contract and breach of the duty of good faith and fair dealing "came too late" because PRSI waited until after it had rested to nonsuit. Parties have an absolute right to nonsuit their own claims for relief at any time during the litigation until they have introduced all evidence other than rebuttal evidence at trial. TEX. R. CIV. P. 162; *Villafani v. Trejo*, 251 S.W.3d 466, 468–69 (Tex. 2008).

PRSI concedes that the judgment should be reformed to reflect a take-nothing judgment on its claims for breach of contract and breach of the duty of good faith and fair dealing. PRSI states that while Austin's argument that PRSI nonsuited those claims after resting could serve as a ground for reformation, it asserts that the "larger reason" is PRSI did not introduce evidence of nor submit questions to the jury on those fact-based claims; therefore, the proper judgment is to render judgment for BAIC on PRSI's claims for breach of contract and breach of the duty of good faith and fair dealing. *See AVCO Corp.*, 251 S.W.3d at 666 ("When a plaintiff fails to request an issue and an affirmative finding regarding the omitted issue is essential to recovery, the trial court must render judgment for the defendant."). We conclude that the judgment should be reformed to delete that portion of the judgment finding that PRSI had nonsuited, without prejudice, its claims against BAIC for breach of contract and breach of the duty of good faith and fair dealing, and a take-nothing judgment should be rendered on those claims.

## F. Conclusion

We affirm that portion of the judgment awarding additional insured status to PRSI. We reverse that portion of the judgment awarding contractual contribution to PRSI, and render judgment that PRSI take nothing on that claim. We reform the judgment to delete the trial court's finding that PRSI nonsuited, without prejudice, its claims against BAIC for breach of contract and breach of the duty of good faith and fair dealing, and render judgment that PRSI take nothing on those claims.

## III. CONCLUSION

To summarize, we (1) affirm that portion of judgment awarding damages to McCraven, plus pre- and post-judgment interest and costs; (2) affirm that portion of the judgment apportioning responsibility for McCraven as 75% to PRSI, 20% to Austin, and 5% to McCraven; (3) affirm that portion of the judgment awarding additional insured status to PRSI; (4) reverse that portion of the judgment awarding contractual contribution to PRSI, and render judgment that PRSI take nothing on that claim; and (5) reform the judgment to delete the trial court's finding that PRSI nonsuited, without prejudice, its claims against BAIC for breach of contract and breach of the duty of good faith and fair dealing, and render judgment that PRSI take nothing on those claims. Accordingly, we affirm the judgment, in part, and reverse and render, in part.


/s/    Sharon McCally
       Justice

Panel consists of Justices Brown, Boyce, and McCally.